ELLEN HARRIS, Plaintiff, v. THE AMERICAN BIBLE SOCIETY and Others, Defendants.

*Will— Construction—Life Estate—Estate in fee—Statute relative to Bequests.*

CORNELIUS SEBRING died previously to 1830, seized, inter alia, of a lot of land in Ovid, Seneca county, containing about thirty acres. He left two sons and four daughters, his only heirs-at-law. His son Folkerd died in 1861, without issue, but leaving a will, which purports to dispose of his whole estate. In 1862, Ellen Harris, the Plaintiff, one of the daughters, brought an action in the Supreme Court for a partition of the thirty-acre lot, claiming one-fifth thereof, by descent. She claims that the dispositions of her brother Folkerd's will in favor of religious societies or institutions are void, and asks for a determination accordingly.

Cornelius Sebring left a will, the material portions of which are as follows :

"As for my worldly estate, after my decease [my will is that it] be disposed of in manner following :

"*Second.* I give to my four daughters   *   *   *   each one-sixth of my personal property not otherwise disposed of.

"*Third.* I give and bequeath my son Folkerd thirty acres of land on which he now lives, my young black mare, two hundred dollars in six months after my decease, and one-sixth part of my personal property not otherwise disposed of.

"*Fourth.* I give and bequeath to my son John the farm on which I now live, containing one hundred and one acres, my brown horse, bay horse, sucking colt, farm wagon, sled, and farming utensils, and one-sixth of my personal property not otherwise disposed of, provided he pay six hundred dollars legacy, support his mother, and pay fifteen dollars annually to my step-mother."

Folkerd C. Sebring by his will gave his wife a life estate in all his property, real and personal, and directed that on her death the whole should be sold by his executors, " and that the proceeds

thereof be paid over to the following-named charitable societies in four equal portions."

One portion is allotted to "The American Board of Commissioners for Foreign Missions," a corporation duly incorporated by the State of Massachusetts for the purpose of propagating the Gospel in heathen lands.

Another is allotted to "The American Bible Society," and another to "The American Tract Society."

The two latter societies are New York corporations (Laws N. Y. 1841, pp. 41, 249). The general capacity of these three corporations to take, as contemplated by the testator, is not the question.

The other fourth part or portion is given in the following words:

"Another fourth part of all the proceeds  *   *   *  to be paid over to the Trustees of the Presbyterian House incorporated April 21, 1855, by the Legislature of Pennsylvania, to be expended under the direction and for the appropriate uses of the Home Mission Committee of the General Assembly of the Presbyterian Church in the United States of America."

The Legislature of Pennsylvania, on the said 21st day of April, 1855, passed an act, which, after reciting that "The General Assembly of the Presbyterian Church," which held its session in Philadelphia in May, 1854, had appointed John A. Brown and others named "Trustees of the Presbyterian House," created those persons and their successors a corporate body by the name of the "Trustees of the Presbyterian House."

The preamble recites a request that the act of incorporation "should contain a general provision authorizing the said trustees to hold, in trust for said assembly, any property committed to them by donations, bequests, or otherwise."

The 4th section of the act is as follows: "That the Trustees hereby incorporated, and their successors, shall be subject to the direction of the said assembly and their successors, have full power to manage all funds, property, and effects committed to their care, by gift, purchase, bequest, or otherwise, and to execute

any trusts confided to them by said General Assembly, or their successors, in such manner as shall be deemed most advantageous, and not contrary to law or the intention of the donor or testator."

The action was tried at a Special Term in the county of Seneca, where the complaint was dismissed, with costs. On an appeal taken by the Plaintiff, a General Term in the Seventh District, modifying the judgment, declared that Folkerd took a fee-simple in the thirty-acre lot under his father's will; that the provision of Folkerd's will directing the sale was valid as a power in trust; that the bequests to the four societies "were valid to the extent only of one-half of the property *so bequeathed* to each." The General Term also directed, that after the death of decedent's widow, the whole of Folkerd's real and personal estate be converted into money, and after paying to the Plaintiff, the executors, and the four corporations their costs of this action, that one-eighth part of the net proceeds be paid to each of the four corporations.

Distribution of the residue of the proceeds was also directed among the individual Defendants who are descendants of C. Sebring.

The Plaintiff appeals to this Court from so much of the judgment as adjudges that Folkerd took a fee in the thirty-acre lot; that the Presbyterian House is entitled to any proceeds of his estate, and from the award of costs to the Defendants.

The four corporations appealed from so much of the judgment as reduced their respective bequests below one-fourth of the proceeds of Folkerd's estate, and also from the directions concerning costs.

*John E. Seeley*, of counsel for Plaintiff.

*Samuel A. Foot*, of counsel for Bible Society.

*George A. Titus*, of counsel for American Tract Society.

FULLERTON, J.—1. When Cornelius Sebring's will went into operation, the words of the third clause, devising the thirty-acre parcel to Folkerd, without superadded words of limitation, imported a life estate, and no more.

The ancient and well-established rule of construction which produced this consequence, has from an early period been considered by eminent judges as almost invariably defeating the intent (Cowper, 355).

In Denne *v.* Page (11 East, 605, note), Lord Mansfield therefore says, that " Courts have been astute to find out, if possible, from other parts of a will, what the testator really intended; and it is with pleasure that they have found, in hundreds of cases, sufficient to warrant them in giving full effect to that intention."

At length, in 1830, the rule was abolished by statute in this State (1 R. S. 748, § 1, original paging. See Reviser's Note, 3 R. S. p. 601, 2d ed.).

In 1837 the British Parliament adopted a similar enactment (1 Vict. ch. 26, §§ 1 and 28).

And Mr. Justice Grier states, no doubt correctly, in 2 Black's R. 414, that the same beneficial change has been in like manner effected in most, if not all the States of this Union. Still, the rule must be applied to instruments which took effect during its existence; and hence the necessity of considering whether the devise in question is controlled by it.

Resort may be had to every part of a will in order to ascertain the sense in which the testator may have employed any particular word or clause on which a question arises; and accordingly, a number of circumstances appearing in this instrument are relied upon as evidence that the testator intended in this instance to give a fee.

He set out with a declaration of his will that his " worldly estate," after his decease, should "be disposed of in the manner following." He then gave the thirty-acre lot in question to Folkerd by its local description, without any words limiting the estate given; and he further gave another lot of land in like manner to his son John, and disposed of the whole residue of his personal estate in equal portions to the two sons and his four daughters, each taking one-sixth part thereof.

The fourth clause, containing the devise to John, contains also a bequest of sundry specific chattels, a sixth share of the residuary

personal estate, and concludes thus: "Provided he [John] pay $600 legacy, support his mother, and pay $15 annually to my step-mother." This is a charge on John personally.

It is expressed as a condition, and there is nothing to confine it to the bequest, or to prevent its being interpreted as equally applicable to the devise.

John could not have accepted the gifts, or either of them, or any part of either, without becoming liable to the respective beneficiaries mentioned in the proviso, for all the duties and payments thereby charged upon him. This disposition gave John a fee in the farm devised to him, notwithstanding that the devising clause contains no words of limitation.

It may be proper to cite a few links of the unbroken chain of authorities by which this proposition is supported (Collier's case, 6 Coke, 16; Doe *v.* Holmes, 8 T. R. 1; Jackson *v.* Martin, 18 Johns. 36; Spraker *v.* Van Alstyne, 18 Wend. 205). King *v.* Ackerman (2 Black, 408) presented the point under circumstances essentially similar to those which attend this devise to John.

It arose on a devise of lands in New York. The devisee took a fee in other lands by force of certain inartificial words employed by the testator in connection with *that* devise; but the lands in question were devised to him by mere local description, without words of limitation; and certain legacies were charged upon him in general terms, not specially referable to either devise.

Evidence was offered that the land devised in fee was in value more than sufficient to pay the legacies. Its rejection was approved. The Court say: "It is clear that [the devisee] could not repudiate his obligation to pay the legacies by refusing to accept the gift [in fee] while he retained the lands in question. * * * A Court may look beyond the face of the will, where there is an ambiguity as to the person or property to which it is applicable; but no case can be found where such testimony has been introduced to enlarge or diminish the estate devised." Many authorities to the same effect are cited in 41 Barbour, pp. 535 to 540.

It may be presumed that the devisor had no other real estate than the two parcels devised to his sons.

It is therefore apparent that the testator has not failed to make a complete disposition of all his property, in conformity with his declared intent, unless, indeed, the devise to Folkerd is to be deemed for life only. The intestacy can extend, at most, no further than to the inheritance or remainder in fee in the thirty-acre lot after the death of Folkerd.

The form of the introductory clause, and the fact that the residuary dispositions are of the entire personalty, and are expressly confined to personal estate, are relied upon as sufficient evidence of an intent to give a fee by the devise to Folkerd.

In Frogmorton *v.* Holyday (3 Burr. 1618) these circumstances concurred, and Lord Mansfield expressed the opinion that, taken together, they would cause a fee to pass under such an indefinite devise. In that case the devisee took a fee on another ground. Sir William Blackstone was of counsel against the devisee, and he gives his very able argument in his own reports.

He does not state that Wilmot, the only other Judge present, concurred with his senior on the point now in question; but represents him as using very peculiar language about "this kind of loose evidence being twisted together" (S. C., 1 Wm. Bl. 535). That case was decided in 1765. Eight years afterward, De Gray, Ch.J., with the unanimous concurrence of his associates, decided the other way in the Common Pleas, on a will presenting the same point precisely (Frogmorton *v.* Wright, 3 Wilson, 414; S. C., 2 Wm. Blackstone, 889).

As to such an introductory clause alone, the established doctrine is stated by Chancellor Kent, in 1 Johns. Ch. R. 498. It is "not sufficient without an actual devise. It must appear that the testator not only did not intend to die [intestate], but that he did not, in fact, die intestate." This has been so often and so emphatically adjudged in England and in this State that it ought not now be questioned (2 Jarman on Wills, 3 ; Lond. ed. p. 247 ; Barheydt *v.* Barheydt, 20 Wend. 576, 581; Harvey *v.* Olmsted, 1 Comst. 490).

I cannot think that the complete disposition of the personalty improves the claim that Folkerd took a fee. Such introductory words are almost universally employed in wills drawn by unprofessional persons (2 Wm. Bl. 537).

A residuary clause is nearly as common, and the latter is generally intended to include personal property only, and is usually so limited in terms.

The introductory clause has been denied the effect now claimed for it, mainly because it is merely a common form to which testators are not supposed to give much attention. The same reasoning applies in a considerable degree to the residuary clause. If, from the circumstances relied upon in this connection, we should impute to the testator an intent to give a fee, by words which import a less estate, we must charge him with ignorance. It would certainly be at least as proper and more charitable to suppose forgetfulness. The first is, in some degree, a deliberate fault of life; the latter is but the accident of an hour, and that, perhaps, an hour of dying agony.

Adopting the strongly expressed views of Judge Gardiner in the case cited (1 Comst. 490), I conclude that a fee cannot be adjudged to have passed on this ground. The introductory clause thus coupled with the almost perfect completeness of the disposition, and the limitation of the residuary gifts to personalty only, have no greater just effect than to excite an apprehension that the testator may probably have intended to give his son Folkerd a fee.

But a mere conjecture of this sort should never be permitted to subvert the clear and positive title conferred by the Statute of Descents. The great respect entertained for its author has probably protected from criticism the opinion in 3 Burr.; but, as we have seen, it was disregarded in England soon after it was ventilated; and I cannot find that it has ever been adopted or approved in such a way as to re-enforce its authority. Ferris *v.* Smith (17 Johns. 223) presented the precise question.

The opinion in 3 Burr. was cited, but the Court, silently disregarding it, ruled that the devisee took only an estate for life.

It was cited and treated in the same way in the analogous case of Doe *v.* Allen (8 T. R. 500, 501, 502).

I must regard that opinion as being overruled by these two subsequent decisions.

The clause devising the land to Folkerd includes, in the same sentence, a gift of personalty; and it is suggested that because he takes the latter absolutely, he should be held to take a like interest under the devise.

Very many adjudged cases have occurred presenting the same feature; but the decisions do not support the position asserted. The different nature of the property demands a different application of the testator's language.

Personal property is deemed of so evanescent a character that the law does not recognize any estate as existing in it (Williams on Personal Property, pp. 7, 186, 187). Hence a gift of a chattel is always absolute, unless expressly qualified; in respect to things real, the reverse has always been the legal intendment.

The fact that if the remainder in fee was not deemed to pass by the devise, the devisee himself would take part of it, is quite inconsequential; and I proceed to examine the only remaining ground on which a fee is claimed to have passed to Folkerd. The testator gave a farm to his son John in precisely the same terms which he employed to devise this thirty-acre tract to Folkerd. He imposed a charge upon John which, as we have seen, is conclusive evidence that he intended to give a fee to John.

Such a charge "doth plainly prove that the intent of the testator was, that the devisee should have an estate in fee-simple" (Reed *v.* Hatton, 2. Mod. 26). It is only as proof of the intent that the charge could so operate. Of itself, it works no change in the import of the devising clause. Courts have no legislative authority; they cannot forcibly enlarge the devise without the testator's consent, and beyond the meaning of his words, merely to effectuate what they suppose to be abstractly just and proper.

The only legitimate ground of decision in this class of cases is,

that by making the charge upon the person of the devisee, the testator has certified on the face of the will his intention to give a fee. This involves a declaration on his part that, when using in the devise words which, in legal construction, would give only a life estate, he was ignorant of that rule, and supposed that these words were sufficient to give a fee. Then he must, of course, have intended that exactly similar words employed by him in the same instrument, for exactly a similar purpose, should have a similar interpretation and effect.

It is well settled that where a testator thus manifests in the will his conception of the meaning of a particular word, phrase, or formula, the courts will so interpret it where it occurs in other parts of the instrument (Den *v.* Trout, 15 East, 398; Cutter *v.* Doughty, 7 Hill, 305).

No particular method of expression is required of a testator. He must use correct language, or, if unable so to do, he must furnish within the will itself a key to the interpretation. The latter has been done in the present case; and, on this ground, I am of the opinion that Folkerd took a fee.

In Doe *v.* Snelling (5 East, 91), the will under consideration contained, as in the present case, two indefinite devises. The Court held, that under one of them a pecuniary charge in the will gave a fee. As to the other, which was not in question, Lord Ellenborough remarked that it "might probably be contended to pass only a life estate  *  *  if any question should arise upon it."

Matthews *v.* Windross (2 Kay & Johnson, 406; 2d Jurist Rep., N. S. 926), and also Morris *v.* Lloyd (33 Law Journal, N. S., Exchequer, p. 202), were both cases upon wills presenting the same features as Doe *v.* Snelling; and in each case both of the indefinite devises were before the Court for construction.

In the last-named two cases the counsel of the devisees, in respect to whose devises there was no charge, argued for the position which I have here advanced.

In both cases the Court decided against that position. But the intimation of Lord Ellenborough, and the judgments in the other

two cases, are too recent to be binding as authority, and they all labor under an infirmity which should greatly diminish their influence.

The charge in each instance, in point of fact, was on the land devised, and *not on the person of the devisee.*

Therefore, according to established principles, it did not change the effect of the devising clause, and no fee was given thereby. (See Sir James Mansfield's opinion in Doe *v.* Clarke, 5 B. & Puller, 350, approved by Kent, Ch.J., in Jackson *v.* Bull, 10 Johns. 148. See also Olmsted *v.* Olmsted, 4 Comst. 60; Mesick *v.* New, 3 Seld. 165, 170.)

In the case of Lee *v.* Withers (Sir Thos. Jones' Rep. 107), the will before the Court contained two indefinite devises of two separate pieces of land by a father to his two sons, John and James Moorey. The devises, as in this case, were indefinite, and were in the same terms, and there was a distinct charge on the person of James, which was rightly held to give him a fee.

Immediately after stating the facts, Jones says: "Et fuit resolve sans difficulty que John had estate forsque sa vie."

No argument of counsel is given, nor any reasons assigned by the Court; and the judgment given, as stated at the end of the report, is only on the devise to James.

The case is also reported in 2 Shower, 49, under the title of Lee *v.* Stephens and others.

In the latter report nothing appears concerning John or the devise to him, and the judgment is stated as having been on James' title only.

Sir Henry Pollexfen was of counsel for the heir-at-law in this case, and there is what might be called a report of it in Pollexfen's R. p. 539. It states the facts in full, and gives the following argument: "I take it that by the will, John Moorey had nothing but an estate for life; the words are, 'I give and bequeath to my son, John Moorey, my lands,' &c. There is nothing that gives any ground or cause for any constructive fee to pass by these words." No argument on the other side appears; and there is no reference to the Court, except a statement that it was adjudged

James had a fee. Pollexfen's Reports were not published in his lifetime; and this, like many other quasi reports in the book, is evidently no more than a copy of Pollexfen's brief prepared before the argument, with a mere note of the decision at the foot. (See Wallace on the Reporters, p. 219, article Pollexfen.)

On the whole, I see no satisfactory evidence that the devise to John Moorey was ever debated in Court, or passed upon by the Judges. The contrary may well be the fact, and, if so, there is no English authority against the conclusion at which I have arrived. Even if we are bound to believe that Chief Justice Scroggs and his companions, in the thirty-first year of Charles the Second, did consider the point, this Court may rightfully reconsider it, and adopt a more sound and just interpretation.

The intent to give a fee to Folkerd is manifest; and it is clearly expressed by the testator himself on the face of the will.

Precedents, if they existed, could hardly justify a refusal to see it, and adjudge accordingly.

2. The beneficiaries contemplated by the third clause of Folkerd C. Sebring's will are plainly therein designated as four " societies." The ultimate and real beneficiary, under the direction to pay over to " The Trustees of the Presbyterian House," is not that corporate entity, nor the individual persons composing it, but some " society."

By turning to the Pennsylvania statute referred to by the will, and reading it as if incorporated with the will (21 N. Y. Rep. 330, 331), we find that the " society " for whose benefit this direction is given is the whole mass of persons constituting the Presbyterian Church in this country, or their General Assembly, viewed as a continuous body, or a particular session of that Assembly which met in Philadelphia in 1854, or a certain committee of such General Assembly, viewing the latter in one or other of the aspects just specified. The will gives this committee's title as " The Home Mission Committee."

None of these bodies are incorporated; and it may be assumed that a direct bequest to any of them, or to an individual for their

use, in the general form in which they are referred to by this will as beneficiaries, would be void for uncertainty.

But it is further contended, that although the bequest is to a corporate body, it is still void because the beneficiaries are thus undefined, and are not themselves incorporated.

It is asserted that the corporation has no interest, and is a mere conduit-pipe, through which the money is to flow into the hands of the ultimate beneficiaries.

This is not exactly the fact. By the will, the fund is to be "expended" under the *direction* of the beneficiaries. This implies the very reverse of a simple payment over to the latter.

By the act, this corporation is to "manage" all funds thus coming to its hands. This, to be sure, must be done "subject to the direction of the General Assembly, or their successors."

In both these respects the will and the act substantially correspond. The latter, it is true, enjoins upon the Assembly the practice of issuing its directions to the corporation through a certain specified committee of its body ; and perhaps it also requires the Assembly to devote this portion of its funds to uses supervised by that same committee. The corporate body, however, is to be the managing and disbursing trustee of the bequeathed fund.

As a corporate entity, it is to hold the custody thereof, and the legal title thereto.

Both in respect to real and personal property, it is established doctrine, that a trustee to receive, manage, and disburse, or even with less powers, has the legal title, and is, in contemplation of law, the owner of the property. It must, however, be conceded that the corporate body, and the corporators, were without any actual right to any beneficial enjoyment; they merely sustain a burden for the enjoyment of the society referred to. But it seems to me that the absence of such right in the corporation, or its corporators, is not material; for such is the condition of most charitable corporations.

The beneficiaries of funds held by incorporated hospitals are persons not entitled to membership in the corporations. And it

rarely happens that in such hospitals the corporate body, or any individual member thereof, has any beneficial interest. The fact appearing in this case, that the corporation must, in all substantial respects, obey the orders of the unincorporated and fluctuating multitude for whose use it was created, or the orders of the committee thereof, can have no influence on the validity of the bequest.

Ordinary corporate bodies having charge of the temporalities of our churches are very nearly in this condition; and if they were absolutely and entirely in it—that is to say, if the trustees were forbidden to disburse a dollar without asking the directions of a mass meeting of those who, for the time being, might chance to be attending worshippers—the corporate body would not the less satisfy the requisites of our law concerning gifts to charities, in the particulars now under consideration. The objections to the capacity of this corporation to receive the testator's intended bequest, seem to me, therefore, to be unfounded.

They originate in conceptions impracticably refined and subtle.

Such rigorous constructions are not adapted to the actual concerns of life. The cases cited have been examined, as also the learned and elaborate opinion of the present Chief Judge (Davies) in Downing *v.* Marshall, reported by Mr. Howard (23 Practice Reports, p. 10). The Plaintiff virtually admits every proposition required to support the bequest to "The Presbyterian House," except what may be involved in the nice criticism referred to, and that is not, in my judgment, supported by anything found in these citations.

3. The act relating to wills (Laws of 1860, p. 607) enacts that "No person having a husband, wife, child, or parent, shall, by his or her last will and testament, devise or bequeath to any benevolent, charitable, literary, scientific, religious, or missionary society, association, or corporation, in trust or otherwise, more than one-half part of his or her estate, after the payment of his or her debts (and such devise or bequest shall be valid to the extent of one-half, and no more)."

32

The testator left no relative or connection named in this act, except a wife, and she consented to the disposition.

The societies contend that the act was made exclusively for the benefit of the persons referred to by it, and that no others can insist upon the prohibition, or claim its enforcement.

The General Term held, and, I think, correctly, that the prohibition is peremptory, and may be insisted on by any person who would derive a benefit therefrom.

The language is absolute; and if the Courts have power in any such case to judge concerning the probable motives of the Legislature, and may imply, accordingly, an exception to the positive terms of a statute (on which no opinion need now be expressed), I am unable to discover any safe ground for such a proceeding in this instance.

Consistently with this act a testator, having the relatives and connections specified, may give half of his estate to a nephew, or any remote collateral relative, or, indeed, to entire strangers, and give the other half to the societies described.

It is, therefore, quite clear that it was not designed to compel testators to provide for their families. If a man whose entire estate consisted in realty, and who had none of the relatives mentioned, and only a wife, should die without a will, his widow would take only a life estate in one-third of his lands.

Yet in such a case the statute of 1860 avoids the devises which such a person might have made, to a much greater extent than is necessary to protect all benefit which the widow could possibly have derived from an intestacy.

The widow may have been barred of dower by a jointure (1 R. S. p. 741, §§ 9, 10, 1st ed.). She may have been incompetent to take from alienism; yet, in either of these cases, if the construction claimed be correct, her consent alone would give effect to a devise not otherwise sustainable.

So to hold would not be implying an exception, from the nature and reason of the thing (1 Johns. Cases, 131).

It would be repugnant to both, and violative of our plain duty, to administer the law as we find it written.

The reasons assigned by Judge T. A. Johnson in support of the judgment below on this point, are satisfactory and conclusive (Harris v. Slaght, 46 Barb. 470).

. 4. The enactment in question is, that no person shall "by will or testament give or bequeath" to any society of the classes named, "more than one-half part of his or her estate, after payment of his or her debts."

As the parties concur, and perhaps rightly, in construing this act as prohibiting dispositions to these purposes, by the same testator, which, taken together, exceed one-half of his entire estate, I will assume that such is the law. No doubt it was the legislative intent.

The Supreme Court determined that the societies can take only one-half of the proceeds which may be realized on a sale of the estate at the widow's death.

On this a question arises whether the statute, in speaking of one-half of the testator's estate, is not to be regarded as referring to the estate left at the testator's death.

Upon the words and the reason of the thing the affirmative is quite clear. No higher authority can be found; nor does a resort to precedents seem needful on a point so plain.

If a man leaving two infant children should give each an estate for life, with remainder in fee to his issue, should limit cross-remainders in fee in default of issue, and make an ulterior disposition for a sale, and the payment of proceeds to charitable societies on failure of issue living at the survivor's death, the judgment below assumes that, on the occurrence of the latter contingency, the societies could take only half of the value at that time.

Nearly or quite a century might have elapsed, and, owing to depreciation or other causes, the proceeds might not amount to one-tenth of what was the value at the testator's death. Yet it is supposed that one-half of this diminished fund should go as upon an intestacy to the next of kin. I do not think so.

The Roman Lex Falcidia forbade a testator to give more in legacies than three-fourths of his effects; so that there must remain to the heir one-fourth (Justinian's Institutes, book 2,

chap. 22; see Cooper's edition, page 173; see the law itself in the Digest, lib. 35, tit. 2, l. 1).

Like the act now under consideration, this law does not, in terms, specify any time for the valuation.

But, commenting upon it, the Institute speaks as follows:—

"The law Falcidia looks to the quantity of his estate at the time of the death of the testator; and therefore, if he who is worth but an hundred aurei at his decease, bequeath them all in legacies, the legatees must suffer a defalcation; for they will be entitled to no advantage, although the inheritance, after the death of the testator, and before it is entered upon, should so increase by the acquisition of slaves, the children of female slaves, or the product of cattle, that after a full payment of the 100 aurei in legacies an entire fourth of the whole estate might remain to the heir; the legacies, notwithstanding, would still be liable to a deduction of one-fourth.

"On the contrary, if the same testator had bequeathed only 75 aurei, then although, before the entrance of the heir, the estate should so decrease by fire, shipwreck, or the loss of slaves, that its whole value should not be more than 75 aurei, or less, yet the legacies would still be due without defalcation" (Justinian's Institutes, book 2, chap. 22, § 2; see Cooper's ed., p. 174, and also the editor's note on this § 2 at page 533).

In Sander's Institutes of Justinian (p. 336, 3d ed., 1865), it is said that "the calculation under the Lex Falcidia was made at the time of the testator's death."

The subject is treated of to the same effect, and with great fulness and detail, by Domat (Domat's Civil Law, part 2, book 4, title 3, § 1, articles 3706, 3707, 3708; see Boston ed., 1850, edited by Cushing, vol. 2, p. 588).

When a testator disposes of his property in such a manner that one-half of the corpus can be severed from the other at his death, the administration under the statute of 1860 is very simple. But if (as he may) he devises it by way of successive estates, or interests, the task of distribution between his next of kin and the charitable societies to whom he has bequeathed in excess of his

Opinion by FULLERTON, J.

powers may be somewhat more difficult.    Still it is not imprac-
ticable.

It should be adjudged that the four societies will not be entitled
to receive a greater sum in the whole, from the proceeds of the
sale directed by Folkerd C. Sebring's will, than would be suffi-
cient, on a proper calculation, to pay and satisfy at that time a
debt then yet remaining unpaid, which, at the testator's death,
was equal in amount to the then value of one-half of the testator's
estate, over and above his debts.

And also, that if there should be any residue of such proceeds,
the costs awarded in the Court below be paid out of the same,
and the balance thereof distributed to the next of kin of the said
testator, in the proportions specified in the judgment of the
General Term.

With these modifications, the judgment appealed from should
be affirmed.

These are my views of this case, and my brethren concur in
them, with this exception:

They are of the opinion that the case of Van Derzee *v.* Van
Derzee (36 N. Y. Rep. 231) controls, and requires a decision that
Folkerd C. Sebring took a life estate only.

I am unable to acquiesce in that conclusion.    But it follows
that the judgment of the General Term, so far as it holds that
Folkerd took a fee, must be reversed; and that with the modi-
fying adjudication above suggested, the judgment must be in
all other respects affirmed.

None of the parties are to have costs on this appeal, and the
proceedings are remitted to the Supreme Court, with directions
to enter judgment accordingly.

Judgment that Sebring took only a life estate, and that on
his decease the estate in the thirty acres mentioned descended to
the heirs of his father, as in case of intestacy.